IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FRANCINE LEAH GINDER | : |
| v. | : NO. 23-CV-4230-SWR |
| MARTIN O'MALLEY,<br>Commissioner of Social Security | : |

**O P I N I O N**

SCOTT W. REID                                                      DATE:  April 18, 2024
UNITED STATES MAGISTRATE JUDGE

Francine Leah Ginder brought this action under 42 U.S.C. §405(g) to obtain review of the decision of the Commissioner of Social Security denying her claim for Disability Insurance Benefits ("DIB").  She has filed a Request for Review to which the Commissioner has responded.  As explained below, I conclude that the Request for Review should be denied and judgment entered in favor of the Commissioner.

I.   *Factual and Procedural Background*

Ginder was born on August 5, 1968.  Record at 236.  She completed high school and two years of college.  Record at 262.  She worked in the past as a staff coordinator at nursing homes, and as a receptionist.  *Id*.  On November 21, 2019, Ginder filed an application for DIB.  Record at 236.  She asserted disability as a result of back injury, diabetes, fibromyalgia, depression, anxiety, insomnia, asthma, and nerve damage in the hands.  Record at 261.  Originally, Ginder alleged that she became disabled on September 11, 2016.  *Id*.  Later, however, she changed her disabled date to June 30, 2018, which was the last day upon which she was insured for purposes of DIB.  Record at 42.

Ginder's application was denied initially and upon reconsideration. Record at 87, 96. Ginder then requested a hearing *de novo* before an Administrative Law Judge ("ALJ"). Record at 99. A hearing was held on September 13, 2022. Record at 37-67. On October 5, 2022, however, the ALJ issued a written decision denying benefits. Record at 17. The Appeals Council denied Ginder's request for review on September 22, 2023, permitting the ALJ's decision to serve as the final decision of the Commissioner of Social Security. Record at 1. Ginder then filed this action.

II.     *Legal Standards*

The role of this court on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. §405(g); *Richardson v. Perales*, 402 U.S. 389 (1971); *Newhouse v. Heckler*, 753 F.2d 283, 285 (3d Cir. 1985). Substantial evidence is relevant evidence which a reasonable mind might deem adequate to support a decision. *Richardson v. Perales*, *supra*, at 401. A reviewing court must also ensure that the ALJ applied the proper legal standards. *Coria v. Heckler*, 750 F.2d 245 (3d Cir. 1984); *Palmisano v. Saul*, Civ. A. No. 20-1628605, 2021 WL 162805 at *3 (E.D. Pa. Apr. 27, 2021).

To prove disability, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." 42 U.S.C. §423(d)(1). As explained in the following agency regulation, each case is evaluated by the Commissioner according to a five-step process:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in §404.1590, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. (iii) At the third step, we

> also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

20 C.F.R. §404.1520(4) (references to other regulations omitted).

Before going from the third to the fourth step, the Commissioner will assess a claimant's residual functional capacity ("RFC") based on all the relevant medical and other evidence in the case record. *Id*. The RFC assessment reflects the most an individual can still do, despite any limitations. SSR 96-8p.

The final two steps of the sequential evaluation then follow:

> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make the adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

*Id*.

III.   *The ALJ's Decision and the Claimant's Request for Review*

In her decision, the ALJ found that Ginder suffered from the severe impairments of diabetes, obesity, asthma, allergic rhinitis, right carpal tunnel syndrome and trigger finger, and lumbar disc disease. Record at 19. She found that the record also supported diagnoses of hyperlipidemia, hypertension, and dermatitis, but that none of these were severe impairments. Record at 19-20. Similarly, she found Ginder's depression and anxiety to be non-severe. Record at 20. She did not make a determination as to Ginder's alleged fibromyalgia. The ALJ then concluded that no impairment, and no combination of impairments met or medically equaled a listed impairment. Record at 22.

3

The ALJ found that Ginder retained the RFC to perform light work, with limitations to simple and routine tasks requiring only frequent (as opposed to constant) reaching, handling, and fingering; occasional postural maneuvers; and no more than occasional exposure to temperature extremes, humidity, wetness, and respiratory irritants. Record at 24.

Relying upon the testimony of a vocational expert who appeared at the hearing, the ALJ concluded that Ginder could not return to any of her previous work, but could work in such jobs as assembler of small parts, marker, or router. Record at 31. Even with a limitation to alternating standing and sitting every 30 minutes, she could work as an assembler or router. Record at 32. The ALJ decided, therefore, that Ginder was not disabled. Record at 32.

In her Request for Review, Ginder maintains that the ALJ erred in (a) failing to address relevant medical evidence in the record; (b) declining to find her fibromyalgia and radiculopathy to be medically determinable impairments; (c) ignoring the effects of her obesity, her urinary frequency, and her mental impairments on her RFC; and (d) inadequately evaluating her hearing testimony.

IV.   *Discussion*

In her unpaginated 43-page brief, Ginder alleges many errors on the part of the ALJ with respect to her impairments, both physical and psychological, criticizing the decision almost sentence by sentence. To treat each allegation separately would result in an opinion with an unwieldy number of discussion sections. Overall review of the record demonstrates that the ALJ's decision was supported by substantial evidence. Accordingly, I will discuss the substantial evidence supporting the ALJ's findings as to each impairment, addressing Ginder's arguments from her Request for Review as appropriate as a part of that discussion.

    A.    *The Physical Impairments*

        1.    *Lumbar Disc Disease*

Despite the size of Ginder's medical record, it does not include a single functional assessment by any of her treating health care providers. Ginder points out that her pain specialist, Gene Levinstein, MD, rated her "Functional Abilities" on each visit, presumably on a ten-point scale. In the year leading up to her date last insured, Ginder's function abilities were almost always rated as "5." Record at 570, 572, 575, 580 ("4"), 583, 585. However, the scores do not appear to be based on specific physical findings, and are probably Ginder's own description of her overall condition.

The state-level physicians who reviewed Ginder's records at the initial and reconsideration stages concluded that the evidence was insufficient to permit a determination as to her physical functional limitations. Record at 73-4 (Gucharan Singh, M.D.), 83-4 (Louis Biagio Bonita, M.D.). Therefore, like the treating physicians, they did not make functional assessments. Nor did they recommend that Ginder be seen by a consulting examiner who could have assessed her functional abilities. Record at 71, 81. Thus, the ALJ had no specific guidance as to how much Ginder could lift, or how long she could stand, walk, sit, and so on.

Nevertheless, an ALJ is empowered to consider all of the evidence in arriving at an RFC assessment. 20 C.F.R. §404.1545(a) ("We will assess your [RFC] based on all the relevant evidence in your case record"); *Chandler v. Commissioner of Soc. Sec.*, 667 F.3d 356, 362 (3d Cir. 2011) ("[T]he ALJ is not precluded from reaching RFC determinations without outside medical expert review of each fact incorporated into the decision").

As to Ginder's lumbar back impairment, the ALJ looked at the objective testing. Record at 26. An April 12, 2017, MRI of the lumbar spine found disc degeneration and a bulging disc to the left at L4-5, as well as diffuse impingement upon the spinal canal at L5-S1. Record at 631. There was no evidence of fracture or dislocation. *Id*. A report on an EMG performed on May 2, 2017, found "evidence of a very mild lower extremity sensory motor peripheral neuropathy." Record at 638. However, the report specified that there was "no evidence of a bilateral extremity radiculopathy." *Id*. This is a significant finding since radiculopathy, colloquially known as a pinched nerve, is characterized by pain, weakness, numbness and tingling, such as Ginder claimed to have in her legs, radiating from her lumbar spine. Https://www.hopkinsmedicine.org>health>radiculopathy.

The record also contains a report from electrodiagnostic neural scanning on March 5, 2012. Record at 472. This showed marked dysfunction at L-4, moderate dysfunction at L-5, and mild dysfunction at S-1. *Id*. Ginder complains that the ALJ erred in failing to mention this testing in her decision. However, the testing took place six years before her alleged disabled date of June 30, 2018, and does not reflect her condition at that time. The 2017 scans are far more relevant. Thus, any error in this regard would be harmless; remand is not necessary to correct an error where it would not affect the outcome of a case. *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005).

Further, the ALJ noted that physical examinations did not show the decreased muscle tone or range of motion which might result in functional limitations. Record at 27. On January 31, 2018, Ginder's pain specialist, Gene Levinstein, MD, found 5/5 strength in both legs, except for 4/5 strength in the left tibialis and extensor hallus, with normal reflexes and coordination, and a normal gait. Record at 570. Straight leg testing, which indicates nerve root irritation, was

negative. *Id.* General practitioner notes, including one from two days before Ginder's last insured date, consistently reported a "normal range of motion." Record at 702 (June 28, 2018), 954, 981, 1023. A later physical examination showed more abnormal results, but since it occurred on June 2, 2020, it was not relevant to Ginder's condition during her insured period. Record at 2139.

The ALJ also relied upon the opinions of the agency reviewing physicians. Record at 29-30. As mentioned above, on both initial review and on reconsideration, the agency physicians were unable to confirm the existence of an impairment. Record at 73 (Dr. Singh: "Based on the available evidence in the file there is insufficient evidence in the file to establish definitive physical impairment [.]"); 82 (Dr. Biagio Bonita: "The evidence in file is insufficient to rate limitations on the allegations(s) because the evidence necessary for a full medical evaluation is not available. Although there is some evidence in file, no ADL's were submitted for the DLI [date last insured] period and I can NOT find detailed MSK [musculoskeletal] /Neuro examination at or near DLI") (capitalization in original).

Ginder emphasizes that she was treated over a period of years for lower back pain by Dr. Levinstein, her pain specialist. Although, as noted above, Dr. Levinstein found Ginder to have nearly full muscular strength as well as a normal gait and reflexes in January, 2018, he also found her to have tenderness throughout her lumbar and sacral spine. Record at 570, 617-18. He assessed her as having up to sixteen back disorders. Record at 575-6.[1]

---

[1] In this note dated October 25, 2017, Dr. Levinstein, or his associate, Melissa Gaspar, included under "Assessments": intervertebral disc disorders with radiculopathy, lumbar region; spondylosis without myelopathy or radiculopathy, lumbar region; intervertebral disc disorders with radiculopathy, lumbosacral region; low back pain; lumbago with sciatica, unspecified side; muscle spasm of back; myalgia; other intervertebral disc displacement, lumbar region; other specified dorsopathies, lumbar region; other specified dorsopathies, lumbosacral region; other spondylosis, lumbar region; radiculopathy, lumbar region; spinal enthesopathy, lumbar region; spinal entheseopathy, lumbosacral region, and sacroiliitis.

Nevertheless, all of these sixteen back disorders amount to different explanations for the same lumbosacral back pain. The ALJ did not deny that Ginder suffered from back pain; she acknowledged that her lumbar disc disease was a severe impairment. Record at 19. She limited Ginder to light work with only occasional postural maneuvers. Record at 24. She elicited from the vocational expert examples of jobs at the light exertional level which could be performed alternating sitting and standing. Record at 32. Ginder argues that the ALJ wrongly failed to acknowledge the evidence of her pain,[2] but if the ALJ had not credited Dr. Levinstein's positive findings and other relevant evidence to some extent, she might not have found Ginder's lumbar disc disease to be severe at all, given the opinions from Drs. Singh and Biagio Bonita.

As a whole, I conclude that Ginder has not shown that the evidence of her lumbar spine impairment compelled a conclusion that she could do less than the limited range of light work specified in the RFC assessment. Nor has she shown that the ALJ erred in a way that undermined her assessment of Ginder's back impairment.

    2.    *Carpal Tunnel Syndrome*

The ALJ found that Ginder suffered from the severe impairments of right-sided carpal tunnel syndrome and trigger-finger. Record at 19. She noted that Ginder underwent a right carpal tunnel release on October 18, 2016. Record at 26. Accordingly, her RFC assessment limited Ginder in her reaching, handling, and fingering. Record at 24.

---

[2] As one example, Ginder argues that the ALJ wrongly ignored the 2017 MRI finding of diffuse impingement. Record at 631. Lumbar impingement generally indicates radiculopathy. Https://www.kcbj.com/blog/nerve-root-impingement. However, the EMG performed less than three weeks after the MRI specifically found "no evidence" of radiculopathy. Record at 638. This would appear to cast doubt on the MRI results. Record at 638.

    Also pertaining to radiculopathy, Ginder argues that the ALJ erred in failing to find it a severe impairment. Radiculopathy, however, is a result of degenerative disc disease, from which she did find Ginder to suffer. Therefore, even if Ginder suffered from radiculopathy in the relevant period, which is not clear, it would not be found to be a separate impairment.

Ginder argues that the ALJ failed to recognize that she told her hand surgeon on October 28, 2016, ten days after the surgery, that her "sensory symptoms" were "not much different at this point," although the trigger finger had resolved. Record at 804. However, she does not point to any records further away from the surgery date which would show that her right-handed carpal tunnel syndrome remained a problem or required further treatment. It was not until 2021 that Ginder was diagnosed with "mild" carpal tunnel syndrome on the left. Record at 29.

Despite Ginder's testimony at the hearing that her hand pain made it difficult for her to drive, type, or hold a pen, which the ALJ noted at page 24 of her decision, the lack of treatment for her hands or wrists since 2016 permitted the ALJ to conclude that she was capable of some use of her hands for lifting, reaching, handling, and fingering. Ginder has not pointed to evidence which would undermine this conclusion.

        3.    *Fibromyalgia*

Fibromyalgia is "a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months." S.S.R. 12-2p. There are "unique difficulties associated with diagnosing fibromyalgia, as there are no objective tests which conclusively confirm the disease." *Merritt v. Berryhill*, Civ. A. No. 17-808, 2018 WL 1162848 at *10 (E.D. Pa. Mar. 5, 2018). There is no specific laboratory test for fibromyalgia. Http://niams.nih.gov/health-topics/fibromyalgia. Further, fibromyalgia patients often manifest normal muscle strength and neurological reactions on examination, and have a full range of motion. *Lintz v. Astrue*, Civ. A. No. 8-424, 2009 WL 1310646 at *7 (W.D. Pa. May 11, 2009).

> In Social Security Ruling 12-2p, the Agency has explained:
>
> We cannot rely upon the physician's diagnosis alone.  The evidence must document that the physician reviewed the person's medical history and conducted a physical exam.  We will review the physician's treatment notes to see if they are consistent with the diagnosis of FM, determine whether the person's symptoms have improved, worsened, or remained stable over time, and establish the physician's assessment over time of the person's physical strength and functional abilities.

2022 WL 3104869 at *2.

SSR 12-2p goes on the describe the required evidence:  "we may find that a person has an MDI [medically determinable impairment] of fibromyalgia if he or she has all three of the following":  (1) a history of widespread pain; (2) at least 11 positive, bilateral, tender points of physical examination at specified locations on the body; and (3) evidence that other disorders that could cause the symptoms or signs were excluded.  SSR 12-2p at IA.  Where trigger points testing is absent, a diagnosis of fibromyalgia can still be found where "repeated manifestations of six or more fibromyalgia signs or co-occurring conditions exist," such as fatigue, cognitive or memory problems, waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome, so long as evidence exists that other disorders that could cause these repeated manifestations were excluded.  SSR 12-2p at IB and ftn. 8.

Ginder argues that the ALJ erred in failing to find that she suffered from fibromyalgia as a severe impairment.  However, her description of the ALJ's assessment of the fibromyalgia allegation is inaccurate.  She maintains that, despite the long-term treatment by a pain specialist, "the ALJ still found Plaintiff's fibromyalgia was not a medically determinable impairment because Plaintiff never treated with a rheumatologist [.]"  Plaintiff's Brief at unnumbered ECF page 17/43.  The ALJ nowhere said this.

Instead, the ALJ wrote:

> Scott Drobnis, M.D., a family physician, examined the claimant on September 3, 2019. The claimant told Dr. Drobnis she had been diagnosed with fibromyalgia in 1989 by a Dr. Fly, who was her primary care provider. She had never been treated or evaluated by a rheumatologist. She stated that she took Lyrica and narcotics in the past, but that she was now off all medications and had significant pain. She stated that she would be fine one moment and then have excruciating pain the next. She also claimed to have "brain fog" and that she had difficulty with recall and speech. Her blood pressure was 134/72 and she weighed 284 pounds but the examination was otherwise unremarkable. Dr. Drobnis noted normal range of motion throughout and no evidence of edema, tenderness or deformity in the joints. He ordered Lyrica and prescribed Vitamin D. By December, 27, 2019, notes showed that her fibromyalgia pain was improved with Lyrica and that she no longer had numbness in the right lower extremity.[3]

Record at 28-9. (Internal citations omitted).

Thus, although the ALJ mentioned the lack of treatment by a rheumatologist, she also mentioned that Lyrica improved Ginder's symptoms, and that she was only "in significant pain" when she was taking no medicine. What is more, the ALJ's observation about the lack of treatment by a rheumatologist came straight from Dr. Drobnis's September 3, 2019, treatment note: "Francine presents today to discuss her fibromyalgia. She tells me that it was diagnosed in 1989 by Dr. Fly (PCP). She has never seen a rheumatologist for this diagnosis (or any diagnosis)." Record at 1326. Thus, the ALJ gave this no more importance than did Ginder's own treating physician.

More importantly, it is clear from Dr. Drobnis's note that he did not independently diagnose Ginder with fibromyalgia. On the contrary, he noted "no tenderness" in his September 3, 2019, musculoskeletal examination of Ginder. Record at 1327.

---

[3] The December 27, 2019, note reads: "Fibromyalgia: Last time I saw her I increased her Lyrica to 150mg bid. She says this is helping. No longer gets numbness RLE. Thinks it is helping overall." Record at 1429.

11

Nor is there any other diagnosis of fibromyalgia in the record which would meet the SSR 12-2p criteria.  The 1989 diagnosis, if it existed, is not there.  Ashley Nelson, M.D., a primary care physician, included fibromyalgia in her list of Ginder's illnesses, but she also noted that other diagnoses such as connective tissue or auto-immune disease had not been ruled out: "Hx fibromyalgia but with low grade fevers r/o AI/CTD."  Record at 2750.  Lab work ordered by Dr. Nelson indicated inflammation in the body, but this is not a sign of fibromyalgia.  Record at 2754.  Http://niams.nih.gov/health-topics/fibromylalgia.

Accordingly, even though Dr. Nelson "noted symptoms consistent with fibromyalgia," as the ALJ expressed it (Record at 27), neither Dr. Nelson nor any other health care provider made a fibromyalgia diagnosis based on their own examination, as required by SSR 12-2p.  Trigger points have never been noted.  Crucially, other disorders which could explain Ginder's symptoms have never been ruled out, as is also specifically required by SSR 12-2p.  On the contrary, Ginder was treated for the lumbar disc impairment and carpal tunnel syndrome discussed above, as well as diabetes.

This lack of a reliable diagnosis may explain the ALJ's failure to specify whether she found fibromyalgia to be a medically determinable impairment.  Arguably, the ALJ should have made an explicit finding, since body pain was central to Ginder's claim of disability.  Nevertheless, because the SSR 12-2p requirements for a diagnosis were not met, remand could not result in a different outcome for Ginder, and therefore any error in this regard was harmless.  *Rutherford*, *supra*.

        4.    *Obesity*

The ALJ acknowledged Ginder's obesity as a severe impairment. She wrote:

> There is no specific listing for obesity. As indicated in SSR 19-2p, obesity may have an adverse impact upon co-existing impairments. For example, obesity may affect the cardiovascular and respiratory systems, making it harder for the chest and lungs to expand and imposing a greater burden upon the heart. It may have an effect on diseases such as Type II diabetes mellitus and certain forms of cancer as well as mental impairments such as depression. In addition, obesity may limit an individual's ability to sustain activity on a regular and continuing basis during an 8-hour workday, five-day week or equivalent schedule. These considerations have been taken into account in reaching the conclusions herein.

Record at 23.

There is certainly some truth to Ginder's claim that the foregoing is boilerplate. After all, there was no suggestion in the record that Ginder had cancer, or that her chest and lungs did not expand properly. The ALJ did not mention obesity again in her decision.

Nevertheless, Ginder has not pointed to any evidence that her obesity caused limitations in excess of those found by the ALJ. SSR 19-2p provides that an ALJ "will not make general assumptions about the … functional effects of obesity combined with another impairment." 2019 WL 237424 at *2. Therefore, such evidence is necessary. Yet, Ginder only points to areas where SSR 19-2p suggests that obesity "*might* impact functioning." *Ginder's Brief* at unpaginated ECF page 21/43. (Emphasis supplied).

The ALJ, in the other hand, was entitled to rely upon evidence that, upon physical examination, Ginder had nearly full muscular strength and a full range of motion. Record at 57, 702, 954, 981, 1023. Further, Ginder did not mention obesity in her Function Report, where she attributes her physical limitations to her back pain and "fibro pain." Record at 281. Moreover, as discussed above, the ALJ limited Ginder to only occasional postural maneuvers, such as bending and kneeling. Record at 24.

In the absence of a showing that the ALJ disregarded specific evidence regarding the functional effects of obesity, I cannot conclude that Ginder has shown error.

        5.        *Urinary Frequency*

In her decision, the ALJ wrote: "[O]ther than urinary frequency, there is no indication of persistent symptoms related to diabetes … ". Record at 30. Ginder criticizes the ALJ for not having imposed a work-related restriction requiring proximity to a bathroom in her RFC assessment. Here again, however, she has not pointed to any evidence that urinary frequency limited her ability to work. There is no such evidence in the record. Ginder did not mention urinary frequency in her application, or in her Function Report, even when asked to explain how her conditions affected her toileting. Record at 278. She did not mention it in her testimony at the hearing, although she was asked why she spent most of her time inside. Record at 56. She has not, therefore, shown error by the ALJ.

        B.        *The Mental Impairments*

The ALJ found Ginder to suffer from depression and anxiety. Record at 3. Although the ALJ found these mental impairments to be non-severe, she nevertheless assessed them under the prescribed psychiatric review technique. 20 U.S.C. §404.1520a; Record at 21-22. The ALJ found Ginder to have mild limitations in all four of the relevant areas: understanding and applying information; interacting with others; concentrating or maintaining pace; and adapting or managing oneself. Record at 21

The ALJ included limitations in the RFC assessment to accommodate Ginder's mild mental limitations. Specifically, she limited Ginder to work requiring only simple and routine tasks. Record at 24. Additionally, the ALJ asked the vocational expert who appeared at the

14

hearing to name appropriate jobs providing for only "occasional interaction with the public and coworkers." Record at 63.

Ginder recognizes that the limitation to "occasional interaction" addressed her mild limitations in interacting with others. However, she argues that the ALJ erred "egregiously" in failing to provide a further limitation addressing how she responds to others on the job site.

Ginder does not offer a suggestion as to what additional limitation would better address how she responds to others. When her argument is examined carefully, however, it seems that her complaint is that the ALJ did not include supervisors in the category of people with whom she could only occasionally interact. This was the issue in *Lofton v. Kijakazi*, Civ. A. No. 21-4284, 2023 WL 1993677 (E.D. Pa. Feb. 14, 2023), which Ginder cites several times. In *Lofton*, however, the ALJ was found to have erred because she was faced with four varying medical opinions as to the claimant's limitation in interacting with or accepting criticism from supervisors, including one finding him to be markedly limited, but did not discuss any of that evidence in her decision. 2023 WL 1993677 at *9.

Here, on the contrary, the ALJ did not ignore any opinion evidence; she had no opinion evidence before her. Just as with her physicians, Ginder's mental health treating professionals did not submit opinions. What is more, the mental health experts who reviewed her records initially and on review found insufficient evidence to assess her functioning in the four areas referenced above. Record at 73 (Erin Urbanowicz, Psy.D.); 83 (John David Chiampi, Ph.D.).

Nor is there evidence from sources other than medical opinions that Ginder had a difficulty in responding to supervisors that would not be covered by a limitation to occasional interaction with all coworkers. The Function Report Ginder completed specifically asked: "How well do you get along with authority figures? (For example, police, bosses, landlords, or

teachers)." Record at 283. Ginder answered "Fine." *Id*. When asked if she had ever lost a job because of problems getting along with other people, she checked off "no." *Id*. Further, at the hearing, Ginder described her workplace anxiety as centering on a fear that she could not get out of the underground room where she worked. Record at 54. Given this record, it cannot be said that the ALJ erred in her treatment of Ginder's limitations arising from her mental impairments.

      C.     *The Hearing Testimony*

In her decision, the ALJ wrote:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

Record at 25.

Ginder argues that this conclusion was erroneous. She writes that a claimant is not "basing his claim on subjective complaints alone … when, as here, there is no dispute that his medical conditions are generally consistent with his self-described limitations." *Ginder's Brief* at unpaginated ECF page 38/43. This is irrelevant. The question is not whether Ginder's medical conditions are "generally consistent" with her self-described limitations – the ALJ conceded that they were – but whether the evidence as a whole supports her self-described limitations in terms of intensity, persistence, and effects.

      This is quite plain from the language of the Social Security regulation which Ginder cites:

> When the medical signs or laboratory findings show that you have a medically determinable impairment(s) that could reasonably be expected to produce your symptoms, such as pain, we must then evaluate the intensity and persistence of your symptoms so that we can determine how your symptoms limit your capacity for work. **In evaluating the intensity and persistence of your symptoms, we consider all of the available evidence from your medical sources and nonmedical sources about how your symptoms affect you. We also consider … medical opinions … .**

16

20 C.F.R. §404.1529(c)(1).  (Bold supplied).

Subjective complaints are evidence, but they are only one kind of evidence, and they are evaluated in relation to the evidence as a whole:

> How we determine the extent to which symptoms, such as pain, affect your capacity to perform basic work activities.  In determining the extent to which your symptoms, such as pain, affect your capacity to perform basic work activities, we consider all of the available evidence described in paragraphs (c)(1) through (c)(3) of this section.  **We will consider your statements about the intensity, persistence, and limiting effects of your symptoms and we will evaluate your statements in relation to the objective medical evidence and other evidence**, in reaching a conclusion as to whether you are disabled.

20 C.F.R. §404.1529(c)(4).  (Bold supplied).

As explained in the foregoing sections of this Opinion, Ginder has not succeeded in showing that the ALJ's treatment of the evidence was erroneous in any respect.  Instead, her decision was adequately supported by substantial evidence, which is the standard to be applied here.  42 U.S.C. §405(g).

V.    *Conclusion*

In accordance with the above discussion, I conclude that the Plaintiff's Request for Review should be DENIED, and judgment entered in favor of the Commissioner.

BY THE COURT:

*/s/ Scott W. Reid*

---

SCOTT W. REID
UNITED STATES MAGISTRATE JUDGE